The next case on our calendar is Joseph Sohm, Visions of America v. Scholastic. Thank you. Morning. It's still morning. My name is Maurice Harmon. With me, we represent Joseph Sohm. With me is Amanda Bruss. There are a lot of issues in this case in the appeal. Ms. Bruss will address the registration issues with your Honor's permission, and I will address the others. Okay. So, there are a couple of matters that we should try to clear up right away. One is with respect to kind of a clerical error that the district judge made with respect to the dismissal of one of the claims that neither parties, that the defendant did not request be dismissed. And that's in the record at A227. And this appeared to just be a counting error. So, there was a chart created by Scholastic that indicated what images it wanted to have dismissed in their motion for summary judgment. The chart indicated a checkmark for those images that were not printed beyond license limits. For some reason, in line number 84, there's a photo in the column next to not overprinted is no checkmark. Unfortunately, Judge Etkin somehow confused that and thought that that was part of the be dismissed. Well, I guess I'll ask them, but it seems like your adversary is agreeing with you on this one, right? Yes. I believe so. I just want to make sure we're clear about it. I would spend a lot of time on that. Understood. The only question was, it appeared there was a brief note in their brief that indicated we had somehow withdrawn this claim. We did not withdraw it and ask for it not to be part of the case. We may have withdrawn it from the motion for summary judgment that we had made. We have conflicting motions for summary judgment. You're arguing that the district court made a serious error in finding that the pricing agreements were licenses? Yes, we are. Can you explain that? Well, yes. In this scenario, pricing agreements were agreed to because of the volume that Scholastic likely, because of the volume Scholastic purchased, but those pricing agreements just set the cost and gave them a discount over what an individual price would be for a similar usage. In your view, when does it become a license? When does it evolve from the larvae stage into a license? When the invoice gets submitted? When there's a specific request by Scholastic pursuant to the terms and conditions that are specifically made a part of the PPA, preferred pricing agreement. That's the title. At that point, then an invoice and licensing agreement, the title of that document is issued, and it has specific use parameters. Most of those are so heavily redacted, they're hard to get a sense of, but that's the second piece that is necessary for there to be a license in your view, sir? Yes. As indicated in the PPA, the preferred pricing agreement, because it says the PPA is specifically subject to the terms and conditions attached to it. If you go to those, they then reference the process where you must request an invoice, then you are subject to the specifics of that invoice, and then goes in various areas into this idea that if you go outside of this invoice, essentially you commit copyright infringement. That's your argument, that it's not a content breach, it is copyright infringement? It's a use beyond the scope of the license. Just recently, this court, Judge Chin's order in Universal Instruments, went a step further in this sense. The court ruled that a contract claim that merely vindicates essentially a copyright violation, would be preempted by an assertion of a contract claim. So we're in the odd position here, where the lower court said, we only have contract claims. The truth of it is that we pled copyright from the beginning, and still contend it's a copyright claim. But if the court follows Universal Instruments, when this case goes back down, he would have to find that the contract claims are preempted by the copyright claims. A big circle, and we get zero. And it just doesn't seem consistent with that notion. There seems to be two kind of major paths that courts have taken. A few courts have taken this Graham-James path, Graham versus James, where the idea is if you have a license, before you can get to a copyright infringement claim, you must show that the license was violated, and then more. You have to show that there was a condition that was violated. And if it's not a condition that's violated, then James seems to say, you don't even have a copyright claim. You only have a contract claim. There's a whole lot of other cases that have said, the majority, vast majority across the country, and different circuits, that use beyond the scope of the license is infringement. So if you truly have an argument about what the scope of the license is, you still look at the contract language of the license. But you're not in there trying to decipher, and you don't assume first, there's a breach of the contract, and second, that if and only if there's a breach of a condition, can you then have a copyright claim? So the confusion apparently here at the lower court, and this wasn't even argued, Scholastic did not in the sense, Scholastic did not claim on summary judgment that it was entitled to It was sort of a one-page argument that there are some facts that remain in dispute about whether this is a condition or a covenant. Judge Etkin unfortunately took that, and on his own, found summary judgment in behalf of Scholastic on this issue. In 125 cases or so, that we have brought, or seen, looked at, we've never had a case anywhere in the country, at district level, or any other level, where there was a condition and covenant analysis and argument in these publishers' cases, where they've licensed for one time, non-exclusive, limits, very clear, 25,000 copies, that's what you get to print. We've never had a court say that a violation of that kind of agreement requires this covenant condition analysis, and denied a copyright infringement claim. This is the very first case in the country that we know about. So yes, we say this is a scope of license issue. But other cases have gone the other way, and it hasn't been teed up as an issue that much, right? Well, frankly . . . Judge Beedlestone, who dealt with a very similar agreement, or set of documents, and she disagreed with Judge Etkin, clearly. Only because Judge Etkin's ruling is the first of that nature in the country, in the ten years. Right, but have there been arguments rejected, arguments like that, rejected in other cases? Not really, not that I saw, are there? Right, but really that's because it's never been seriously argued by the defense. Initially it was. They kind of threw it into the defenses that they had in the answer, and by the time it reached a summary judgment motion, it was abandoned. It was thrown in here and about a page, just to try to keep from having summary judgment issue on the copyright claims. But if the law is going to be that every time you have a copyright claim that results from use beyond license limits, that you have to go through and first prove that there is a violation of the underlying license agreement, and then, and only then, that you have to show it's a condition, then every single time these claims are brought, there's going to be this analysis that's inconsistent with what the courts have said across the country, including Universal Instrument, decided just five days, seven days ago. Not to mention this conundrum of copyright, the Copyright Act preempting, or the breach of contract claim, which puts us in a indefensible position. Counsel, your time has expired. Do you want to turn to Ms. Bross? Yes. And I will give some extra time to Scholastic, because I let that go on. And we reserve two minutes. Yes, I know. Thank you, Your Honor. Just a minute, please. The court, my name is Amanda Bross. I'm also appearing on behalf of SOME, and I'm here to address the registration issue raised by the cross-appeal in this case. We are requesting that Scholastic's request for reversal be denied for two reasons. The first is that Scholastic didn't meet its burden below of showing under 17 U.S.C. 411B that there was inaccurate information included in the Corbis registrations, with the knowledge that that information was inaccurate. And our position is that that's the end of the inquiry. They've missed their opportunity to prove the first step of the two-step inquiry under 411B, and so there's nothing further to be done. Under, as DeliverMed said, in the Seventh Circuit, this is a requirement. It's not an optional thing to do. If there's a claim that there's inaccurate information in registration and that for that reason the case should be dismissed, the court has to go through this process where first there's a showing of inaccurate information, and then second, if that showing is made, that the claim be referred to the Registrar of Copyrights for them to decide that if they had known the correct information, the registration would have been denied. In this case, we already know what the registrar would have done. They have submitted amicus briefs in the Alaska Stock case in Ninth Circuit, which dealt with the exact issue, and then also more recently in the Munch case, which will be before this court appealing the same issue, where the Copyright Office has said, we instructed Corbis and the other members of PACA on how to complete these registrations, and we told them they only needed to include three authors and others in the application. Right, but they don't get to rewrite the statute. If the statute requires you to list the author, they don't get to say, yeah, that's a nuisance. Let's just not do that, right? That's correct. And that's the second part of our argument, is that the statute doesn't require identification of the authors of the constituent works of a collective work. The work being described in Section 409 is the collective work being registered. And that would be... Collective work is the batch of photographs? It's just the catalog of photos that... Yes. ...Corbis has? Even if they're unrelated photographs? Yes, because they're all unpublished and they're registered as a collective work by Corbis. Corbis is the author of the collective work. My baseball card collection, I can register as a collected work. You couldn't because you don't own the copyrights in the baseball cards, for one. You maybe created the collective work so you could register your arrangement of the baseball cards, but your registration would not extend to the cards themselves because... Because the cards have already been published. They have already been published, probably at different times, and because you don't own the copyrights in those baseball cards. The difference here is that Corbis did own the copyrights in the photographs. The photographers all conveyed complete rights to Corbis pursuant to advice by the Copyright Act that it gave back in 1970-something, or 95, actually. The Copyright Act... That makes them the author? It makes them the owner, and the owner of a copyright can register. So if the... All right, but you have to list the author or authors, right? That's what the statute says. You have to list the author or authors of the work. In that section of the statute, work is a singular in every single... So what's the work? What's the work? The work is the collective work. The collective work. The collective work is just a collection of... Baseball cards was a bad analogy. If I collect the paintings of all my family members over the years, and I decide then to register that collected work, I don't have to say who the authors of the works, the individual works are. If they're paintings of your family members, your family members painted the pictures, and they all assigned copyright ownership to you, and none of the images had been published anywhere previously, then your collection of my family's photographs will be registered, and the collection will be my family's photographs, or whatever you decide to title it. And then my family members can sue the infringer, even though they're not listed any place as the author? Yes, Your Honor. Okay. But that's... I mean, and the cases say that, or that's just the practice? That is... The cases say that. The Ninth Circuit says that, and the Fourth Circuit say that. Actually the Ninth Circuit has addressed the exact registrations that we have in this case, so they've gone through the analysis here and have found that, as we have argued, that the work means the collective work, and so by identifying the name of the work and the name of the author of the collective work, they have complied with the statutory requirements. Judge Prescott doesn't agree with you, I guess. She does not. Okay. So we, I mean, we've... I guess we should decide, so we give guidance to the lower courts, right? Yes, Your Honor. Okay. Thanks. Thank you. Thank you. Counsel? We'll hear from Scholastic. Thank you, Your Honors. Edward Rosenthal for Scholastic. So let me start with the district court's decision finding that these were breaches of contract rather than copyright infringement claims. Scholastic is not arguing that every breach of a license is a contract claim. What we're arguing is that the district court correctly found that in this case, looking at all the facts of this case, including the agreement between Scholastic and Corbis, and the agreement between Mr. Sohm and Corbis, that when you look at that in its entirety, it's very clear that using an image in excess of the specifications on the face of an invoice simply breaches a contractual covenant, which gives Mr. Sohm a right under contract law to bring a claim, but not a copyright infringement claim. Doesn't the agreement itself say that there's no license until the invoice has been sent? At least sent. It says that in order, it says that as a condition of this contract, the license, the invoice has to be paid. Here there's no dispute. Well, it can't be paid unless it's been sent, right? Here there's no dispute that the license for the original usage was sent by Corbis, paid by Scholastic. Mr. Sohm then received his 50%. Then the question becomes what happens if there is some use beyond the original specifications on the face of the license? And in the preferred vendor agreement between Scholastic and Corbis- Face of the license, but I think that's a chicken and egg thing, right? They're saying there's no license without the invoice. So if you've exceeded the invoice, you've exceeded the license. You're saying that the agreement is the license, and since the agreement, the pricing agreement, contemplates different payments, depending on the amount of copies, that that's the license. Doesn't the agreement say that that is not the license? What the agreement, well, I don't know that the agreement explicitly says that, but what the agreement makes very clear is that once you enter into this arrangement, an invoice is issued, and it's paid, then you're in the area of the license, and if you look at the preferred vendor agreements, there are all sorts of- Are you relying on any particular language that you can point us to? Sure. Well, in a number of places. Yeah. One is that if you look at the license granted by Corbis, it says that this is on page A-164, and then again, I think it's page 1A-6, well, let's just look at this one. They're two different agreements, but they're similar. It says that any use granted by Corbis is conditioned upon your meeting all conditions and restrictions imposed by Corbis, and Corbis's receipt of payment by you for such use as invoiced by Corbis. Now, maybe that there were additional uses beyond the specifications on the face of the invoice, and that would simply get you to the point where Corbis would then have the right to issue an additional invoice, and Scholastic would pay it, but- Doesn't that same document say unauthorized use of content constitutes infringement of copyright? It does, Your Honor, but just simply saying that something, it may be simply saying in an agreement that something is a breach does not make it a condition of the contract. Let's just step back and look at this overall picture here. Mr. Soam gives Corbis unfettered, complete rights to use his works in any way Corbis wants. Corbis has complete discretion, and this is in the agreement, in Mr. Soam's agreement and in this deposition testimony, to license to Scholastic for any print run, any geographic use, any territory, anything, and all Mr. Soam cares about is that he get paid for, and these are all non-exclusive uses. And under the terms of the agreement, Mr. Soam gets about $115, and if Scholastic used it a little bit more, another $25. But, I mean, the agreement says Corbis grants you a limited, non-exclusive right to use the rights, managed contract, license here under to create, well, the license granted here is contingent on the invoice, isn't it? The license granted, the invoice sets the price. That was the convenient way that Corbis and Scholastic operated, just like an invoice under a master services agreement, where you have this arrangement between Corbis and Scholastic, and then when there's a particular use, Scholastic issues a purchase order, Corbis issues an invoice. You have a limited, non-exclusive right to use this stuff solely as specified in the invoice. Doesn't that make the invoice part of the license, and any use beyond the invoice unlicensed use? We don't agree with that. We believe that the, it may be that Scholastic used beyond the scope of the, may have used the more than was specified on the face of the invoice, and may owe money, because not every breach of a contract. I understand what you're arguing, but how do you make sense out of the language I just read? This is section 3B, the rights managed content. You're looking back at the terms and conditions? A-175 of the appendix. Looking in the other direction. But, because the larger picture arrangement, even if it says that, that doesn't mean that it was a condition to this agreement that Scholastic only print, say, 25,000 copies if that was the number used on the face of the invoice. The license extends solely to the use specified in the invoice, right? So Scholastic may have exceeded the invoice specifications, but that doesn't make it a  Then they've exceeded the license. I believe that what it did is it breached the agreement with Corbis, and therefore Scholastic owes Corbis what it should have paid under the preferred vendor agreement. Can you tell me again why unauthorized use of content constitutes infringement of copyright? Does it mean that? Does it mean what it says? Because Corbis can say that, but simply saying that, and I think Your Honor, this court in the Spinelli case made very clear, you can't turn a contract claim into a copyright claim just by some magic words in an agreement or by some testimony. The real question is, is this a condition to the agreement? Was it a condition to this agreement that Scholastic only print 25,000 copies and not 50,000 copies? The answer is— I don't understand this. They say you can distribute 25,000 copies. The invoice has a specification that will include a print run-in. I'm looking at 127, and am I reading this correctly, where it says distribution quantity 25,000? Yes. And so you're arguing that somehow this means that you have a license to do more than 25,000 even though it only says 25,000? Yes. And what's your reasoning? Because in this case, where Mr. Sohm gave Corbis the absolute right to license for as much as Corbis wanted to license, and where there's a pricing scheme that sets forth exactly what the extra $25 or $50 that Scholastic would have to pay if it used more, then looking at the entire scope of the agreement, then that simply breached the license terms. What Sohm gave to Corbis, it's what Corbis gave to Scholastic that's important, right? But what Corbis gave to Scholastic was a pricing scheme that allowed millions of copies to be printed for certain amounts of money. And this specification's on the front of the invoice, which was really just a convenience thing based on a print estimate. It's part of the— It's part of the overall picture, but— The invoice and the PPA together, right? You have to take all of the—yes, you have to take it all together. And our position is that exceeding the scope of the invoice specifications does not get you into copyright infringement territory. It gets you into— What does? I mean, what makes the invoice then part of the license? It was a payment convenience. It makes it part of— But I quoted you the language. The language says that the invoice basically is part of the license, right? Right. It's part of the— You're saying it's not. I'm saying that you have to read it as it says on the face of the invoice in connection with the pricing agreement and the terms and conditions that are attached to the pricing agreement between Scholastic and Corbis. So what the invoice does is sets up a payment mechanism, but it doesn't mean—just because it says $25,000 on the face of the invoice doesn't mean that printing $25,001 gets you to a breach of the— Where does it say you are authorized to do $25,001? It is inherent, as the court below found, in the overall relationship between Corbis and Scholastic where—and let me just point out a couple of other things. There's a reuse provision, for example, in the agreements between Scholastic and Corbis. So for example, there's a provision that says if Scholastic reuses the image, it pays 75% of the original license amount. That doesn't make any sense if the license simply ended at the point of the $25,001 copy. And similarly, there's a provision that gives Corbis the right to allege that it's entitled to 10 times the original license fee as a remedy for some use beyond the scope of the invoice. And again, that doesn't really make sense if there's no agreement beyond the face of the invoice. I do want to talk about the registration and also damages, Petrella, Papazian, and everything else. That's a couple of big topics. Maybe registration first because Ms. Bress talked about that. Well, Your Honor, the one thing that wasn't pointed out in the briefing, including the case that was submitted as supplemental authority of this case, is the Supreme Court's recent decision in the Fourth Estate case. And that decision, while it did not deal with this particular issue of what 409 means, very, very clearly stated that just because something that courts cannot read out of the statute, the requirements of the statute. And Section 409 says the names of the authors have to be on a copy of registration form. Now, what happened here, and Mr. Soames' counsel pointed this out, is essentially it was a runaround around the requirements of Section 409. Well, a runaround sort of engineered by the Copyright Office, right? Right. It was engineered by the Copyright Office. But it was, what they did was they, so all of these photographers, disparate photographers, no relationship with one another other than the relationship with Corbis, they all assigned their rights to Corbis so that Corbis can register the works and then Corbis assigns back the rights to the individual photographers. Otherwise, the individual photographers wouldn't even be able to bring lawsuit. So it was a completely manipulated way to work around what really is the clear language of Section 409, which is the names of the authors have to be included. And there's a reason for that. All right. But you're asking us then to issue a ruling that will require every single photographer for every single photo to go running to the Copyright Office for registration, right? Well, there are, the Copyright Office has procedures by which photographers can register groups of photos by time periods. Right. So every time they do a new one, they need a new registration, right? And that's, yes. And that's the current state of the law, by the way. The Copyright Office is no longer, doesn't have this scheme any longer. So it does, does it deprive the, it doesn't deprive the copyright owners just like any other photographers, just like any other copyright owner, if they want the benefits of registration, which are required to bring lawsuits and for statutory damages, it has to go through this process. And you can register large blocks of unpublished works, but you have to put your name on the registration because the whole, one of the whole purposes of the registration scheme was so that people could find out what's registered, how there'd be a public repository of information about registration. So this idea that somehow you can get around this by registering thousands of photographers' works and listing three names so that if you look in the Copyright Office records, you at least, with respect to any of these. And then on the, on the damages issue, so which, which has not been addressed at all today. So there are really two parts to this issue. One is this court's ruling in the Sohoyo's case that the discovery rule applies to statutes limitations. And it is our position that this court should reconsider that ruling in light of the Supreme Court's decision in Petrella, which at least cast doubt on whether that rule should apply. And this court has the power to do that. And I can speak. You don't have the power to do that just because doubt was cast? There are cases that say that if intervening Supreme Court case casts doubt on the validity of a, a principle that this court has the power to reconsider its, its decision. But, but I really want to address the damage limitation issue because in, in this, one of the key questions that's come up and it's come up in, in a lot of cases is whether or not, how far back you can go if the discovery rule applies. And what the plaintiffs here say is if an infringement happened in 1995, and there are instances in this case where the invoices go back to 1995, and we didn't discover it, whatever that means, until 2017, we can go back to 1995 and get damages for that entire period. And the Supreme Court in Petrella could not have been clearer that damages can go back three years and only three years from the time of infringement. And while, from the time of filing, excuse me, from the time of filing. And if, if that, that language was integral to the holding of Petrella, Petrella did not address the, the issue of the statute of limitations issue directly. It was a case about laches, but what the Supreme Court said in Petrella was that there is no need for a laches defense for copyright defendants because it's subsumed in the copyright offices, excuse me, in the copyright statutes provision that you only have three years to bring a suit. So under the injury rule or under the discovery rule, a damages should be limited to the three years prior to the filing of the lawsuit, not 20 years. It creates an absurd result where theoretically, and I think we put this in our brief, a plaintiff who discovered something that happened 70 years ago could suddenly come into court and say I get damages for all 70 years while somebody who diligently monitors their, their copyrights would not be entitled to anything more than the last three years of injury. So thank you. So I think I've covered all, all of all the issues we'll hear from Mr Harmon for two minutes. Yes. With respect to Petrella, Petrella was talking about a plaintiff who knew about the infringements for ten years or so. It was the use of Raging Bull, the movie, and a screenplay. And of course, under those circumstances, if you wait as, as Ms. Petrella did until, you know, thirteen years or seven years after you've already known about the infringements and then bring your case, well, then damages would be limited to the three years before  it's dicta. But it's more than dicta. It's just flat out wrong with the discovery rule, right? It's not, because what they were. A successful plaintiff can gain retrospective relief only three years back from the time of suit. No recovery may be had for infringement in earlier years. Profits made in those years remain the defendant's to keep. That's not true for the discovery rule, right? That's not true for the discovery rule. No, they were wrong. They just didn't understand it. They just weren't very smart. No, no, no. They were very smart. They were, uh, they were saying this in the context of a plaintiff who knew ten years before they filed of the infringements, but did not do anything. Right, but that's the argument for latches, right? Is that it's unfair, it's inequitable. And the court said, we don't need to deal with that because, uh, the statute of limitations takes care of this and there's no need to worry about this kind of situation happening because three years is the maximum amount you can get damages for. But with the discovery rule, which the Supreme Court acknowledged is, uh, the prevailing rule in most circuits, that would be wrong. You can go back. That would. It would be a right without a remedy. It would be, in effect, an injury rule because who cares if you can bring your case but you don't get damages before that. But the very important part. There might be a reason for it in terms of injunctive relief. That's true. Correct. But the important part in the statement by Justice Bader, Ruth Bader Ginsburg, was that She's calling herself Ginsburg now. Ginsburg, yes. Was, uh, that within the facts of Petrella, you could not go back before more than three years. And remember what was trying to, what they were trying to do in Petrella was say latches prevented even going back three years before the filing. And the court said, you don't need to assert, we don't need to assert latches because if you find out about your copyright infringement. But it doesn't say only Petrella, it says a successful plaintiff. It's talking more broadly, right? I don't know if Justice Ginsburg was, but the facts of Petrella were not the facts of this case and they weren't a discovery rule case. Isn't this an argument then to go to an injury rule? It's an argument that when you know about infringements for 10 years and you only bring your lawsuit, uh, you know, seven years later, you should not get more damages. But does it mean we should consider that allowing latches for, uh, jurisdictions that use the discovery rule? That may be a question. Did Supreme Court speak to it? That may be a question. But the real problem here is what Mr., uh, what Scholastic said, did in this case is to hide the infringements and make them, uh, and secreted the knowledge of them and still does today, will not release and claims that these should not even be, uh, publicly known in documents filed in the district courts. And they had the information regarding the infringements solely within their own knowledge. The photographers and Corbis had no knowledge of the overruns that were being done here. And that's not Petrella. Petrella is, uh, uh, someone who, uh, had copyrights. They saw the movie being produced everywhere, used everywhere, lots of different, uh, uh, entities producing it, but did nothing. And then finally, after seven years or so, brought her case. So in that context, with those facts, yes, you could only go back, uh, for three years before you filed the lawsuit. And there was an attempt to make some general statements in that case, we believe. And that statement- Your response is to the dissent, right? Not really in this context. The context, it was completely correct what Justice Ginsburg said because of the facts of the case, because Petrella knew so long before she brought the suit of all the claims. There's just one other couple of things I want to say if I could, please. No one pointed out, and of course we had no opportunity to, uh, uh, to brief this, that the PPAs, preferred pricing agreements, were only for two years. So the 2004 agreement expired in 2006. The 2008 agreement expired in 2010. So it didn't even cover the lion's share of the, uh, infringements claimed. So even if the court were to follow Judge Etkin in that sense, there's only, uh, a small number, uh, of claims that fall within the licensing period during which the PPAs were in effect. Um, the, uh, the, there's one other thing, oh, Judge Rakoff has ruled in the district court that you can't contract away your copyrights, that you don't, um, that copyright protection comes from the statute, that you're, the rights being vindicated, the rights here are they, that we control the distribution. They don't control the distribution. So you can have a contract remedy for certain things, but you cannot essentially contract yourself out of copyright infringement. Here we have the opposite. That's what a license, isn't that what a license is? For a limited period of time. But here we have... Sometimes for a limited period of time, sometimes for a longer period of time, but the point here is whether or not this is a license without the invoice. That's really your argument, right? Well as there are... Invoice is what the, what made this a license. Absolutely. And it says invoice and licensing agreement. It's not just invoice. Invoice and licensing agreement. And the terms and conditions are attached to the preferred pricing agreements. So those terms and conditions that say, more particularly, what is the license, are attached themselves to the PPA. The invoice is then, invoice and licensing agreement, is then issued after that point in time. And I just want to address the registration issue. What the Alaska Stock, the Ninth Circuit has ruled, and the Fourth Circuit, is that the collection... What's the difference between a compilation and a collection? Compilation can include collective works. But the compilation is the arrangement of the collective works into some sort of creative feature. Database here. It was a database. It wasn't just a collection. Creative? Yes. By Corbis. The database was created. And then Section 103 says, to the extent of the creation of that collective, you can get a copyright if it's creative enough. But your copyright does not extend to the individual works that are part of that creation. Unless you get ownership. The reason you can't get a collection of baseball cards registered is you don't own the copyright. If you did own the copyright, you could do that. But the point is, in 409, what this Alaska Stock case said is the work that's being named, the name of the work, is not the individual works within the collective. It's the name of the collection. So it was registered as Corbis Database Number 1. That was the name of it. And that is consistent with what the Copyright Office has said, what the U.S. Department of Justice, in their amicus brief, in the Munch case, which is right on the heels of this one, says. And every circuit that's looked at this, and for that matter, virtually every district court that's looked at it, has rejected the Munch case from the district court and accepted Alaska Stock and the real estate case out of the Fourth Circuit. This is a good place to stop. Thank you. Thank you all for a very helpful argument. The next two cases on our calendar are on submission, so I'll ask the clerk to adjourn court.